538 So.2d 1036 (1989)
STATE of Louisiana
v.
Thomas R. WARREN.
No. KA-8762.
Court of Appeal of Louisiana, Fourth Circuit.
January 30, 1989.
*1037 John F. Rowley, Dist. Atty., Glenn E. Diaz, Walker H. Drake, Jr., Asst. Dist. Attys., Chalmette, for plaintiff.
Gregory S. Duhy, Indigent Defenders Bd., Chalmette, for defendant.
Before BARRY, ARMSTRONG and BECKER, JJ.
BARRY, Judge.
The defendant was charged with illegal possession of stolen things valued over $500, La.R.S. 14:69, and a jury found him guilty as charged. His motion to appeal was granted on the same day he filed a motion for a new trial. Immediately after denying the new trial motion, the defendant was sentenced to two years in the parish jail which was suspended, and he was placed on two years active probation with special conditions.
The specifics of the charge include illegal possession of a hydraulic winch, electric fan, butane tank, diesel fuel tank, counter balance valve, steel padeye, two 2 inch couplings, one rotary coupling and one pressure regulator.

ERRORS PATENT
The record contains two errors patent.
The order of appeal was entered after trial but before sentencing. However, we will not dismiss this appeal because "[d]ismissing the appeal would simply result in a delay of the appellate process and hinder defendant's right to appeal." State v. Martin, 483 So.2d 1223, 1225 (La.App. 4th Cir.1986).
The trial court denied the defendant's motion for a new trial and sentenced him the same day, contrary to the 24 hour delay specification in La.C.Cr.P. Art. 873. Such an error is harmless unless the defendant demonstrates that the failure to observe the delay actually caused prejudice. *1038 Martin, 483 So.2d at 1224. The defendant has not demonstrated prejudice.

BACKGROUND
Eustis Evans had stored a 300 pound hydraulic winch for the defendant, his former neighbor. The defendant, who worked as a house trailer mover, was out of town and separated from his wife. Evans claims he was told by Paul Morin that the defendant owed him $800 for the winch which Morin had taken from Elevating Boats, Inc., the shipyard where he was employed. About a year after Evans had custody of the winch he returned it to the defendant's property. Evans told Lynn Dean, owner of the shipyard, where the winch could be found.
Dean and Sheriff's deputies went to the defendant's property where the defendant's son showed them a number of items which he claimed his father had secured from the shipyard.
Evans testified the defendant asked him to store the winch to avoid it being stolen. Evans said he did not know Paul Morin personally or if the winch and other property was stolen from Dean's shipyard.
Thomas Warren, Jr., the defendant's son, testified he knew nothing about the winch until he saw it in Evans' shed, although he told the deputies he thought his father had stolen it. Warren, Jr. identified the winch as belonging to the shipyard because its yellow paint was the color of all of their winches.
Warren, Jr. stated he had seen the allegedly stolen items in his father's shed or yard and the counter balance valve was in the shed for two to three years. He claimed he reported the various items as stolen in order to get back at his father because of the stormy separation from his mother. Warren, Jr. explained that the defendant caused him to be put in jail on trespass charges and had embarrassed him.
Lynn Dean, owner of Elevating Boats, Inc., testified the winch was valued at $3,500, the counter balance at "a couple of hundred dollars," the fan was "around a hundred dollars," the pressure regulator was "about twenty-five dollars," and the 2 inch couplings were "about ten dollars a piece."
Dean stated the winch was painted with his company's color and had his company's configuration on the counter balance valve and motor. Dean said he had sold 50 to 75 similar winches for boats and 50 to 100 winches for cranes, but he never sold a winch to Paul Morin or the defendant. He thought it was unlikely that the winch came from one of his customers because he is usually notified before re-sales. Dean said that to his knowledge no one had used scrap parts to build a winch, and he never sold a winch except when it was part of a crane or boat.
Dean thought the electric fan was stolen from his shipyard because its factory specifications were altered. The guard was installed in the same manner as those used by Elevating Boats. He never sold a fan to the defendant.
Dean testified that the unpainted two inch couplings were machined by Elevating Boats. He thought they were stolen because his company sells the couplings on painted equipment and not individually. Dean did not identify the pressure regulator, the butane tank or the diesel tank as stolen.
Dean testified that Morin had worked at the shipyard as a winch mechanic and the defendant worked "on engines and trucks, or generators and things of that nature." Morin and the defendant occasionally worked together.
Dean said his company did not use inventory control and he did not know that any of the allegedly stolen items were missing.
Paul Morin did not testify. His former girlfriend, Audrey Tate, testified that she heard Morin tell the defendant that he wanted $4,000 for a winch that he had rebuilt and painted at his job. She claims Morin told the defendant in July, 1986 that the winch would be stolen from Elevating Boats. In somewhat confusing testimony, Tate then says the winch was stolen in June, 1986.
*1039 Either date conflicts with Evans' claim that he had stored the winch since about March, 1986. The date given by Evans was corroborated by the defendant.
The defendant admitted buying the winch from Morin with the intention to attach it to a truck for his house trailer moving business. He denied knowing that the winch was stolen and said that every winch he saw was the same color. He explained he never worked in the winch department or built a winch and had no idea that the winch in question had a unique configuration.
The defendant claimed he purchased the fan eight to ten years ago through Martin Melerine, a deceased former part owner of the shipyard. He explained the fan had been altered because, like others at the shipyard, the guard would slip off due to vibrations.
The defendant said he did not know how he acquired possession of the counter balance valve and two inch couplings, but surmised that those items got into his tool box accidentally.

ASSIGNMENT # 1
The defendant claims the trial court erred by admitting hearsay testimony from two witnesses.
Hearsay is testimony in court or written evidence of an out of court statement, where the statement is being offered as an assertion to show the truth of the matter asserted therein, and thus is resting for its value upon the credibility of the out of court asserter. State v. Martin, 356 So.2d 1370 (La.1978).
Evans testified as to what Morin told him about the winch during a telephone conversation. The relevant testimony is as follows:
BY MR. DIAZ:
Q: What actions on your part or what knowledge did you have that made you take the winch from your property and put it back on Mr. Warren's property?
A: I wasat the time Tom Warren was out of town in Alabama and him and his wife had separated, and this is the reason the winch stayed at my house so long. Him and his wife separated and he was in Alabama. I was working with his wife trying to help feed his kids while he was in Alabama, moving house trailers, and this man called me and asked me
BY MS. CROSBIE:
Objection. I don't believe anything that was said to him is admissible.
BY MR. DIAZ:
It's not a hearsay use.
BY THE COURT:
I overrule the objection. I don't think it is for the truth, but the fact that it was said.
BY MS. CROSBIE:
Note my objection.
BY THE WITNESS:
There was a man that called his wife on the phone and she was talking to him and handed me the telephone and the man wanted eight hundred dollars balance on the winch. I said I didn't know what he was talking about. He said, "The winch on your property." I said, "Well, I was under the understanding that belonged to Tom Warren." He said, "Well, he only paid me so much. I want the rest of the money." I said, "You have to talk to Mr. Warren. I don't have no $800.00 to give you." I said, "Well, where did you get the winch at?" He said, "From Lynn Dean's shipyard." I said, "I will bring the winch back and put it on Mr. Warren's property and call Mr. Dean and tell him where his winch was at." And that is what I did.
BY MR. DIAZ:
Who was this person that talked to you?
BY THE WITNESS:
Paul Morin.
The State contends the statements were offered to show the sequence of events, not the truth of the matter asserted, and thus are not hearsay. Alternatively, the statement could be used to show Evans' state of mind, thus admissible as an exception to the hearsay rule.

*1040 The uses of an out of court statement `to show state of mind' present several instances of nonassertive uses of out of court statements. An out of court statement may be used circumstantially to show its effect on the state of mind of a person who heard the statement. An out of court statement may also be offered to show the speaker's state of mind. The statement may be a direct assertion of the speaker's state of mind or it may indirectly tend to establish that the speaker had a particular state of mind. If the statement is a direct assertion of the speaker's state of mind, then it is offered for the truth of the matter asserted but it usually falls within an exception to the hearsay rule for declarations of a then existing state of mind. If the statement only indirectly tends to prove a certain state of mind then it is not hearsay because the truth of the assertion and the credibility of the declarant are not relied upon. Rather, the fact that the statement was made, regardless of its truth, is relevant to show the speaker's knowledge, intent, or some other state of mind. Although in each of the above instances the use of a statement to show state of mind would qualify as nonhearsay or as an exception to the hearsay rule, state of mind evidence is admissible only if the particular person's state of mind which is being shown is itself in issue or is relevant to prove the fact in issue. The fact that the statement is offered for a nonhearsay purpose does not alone make the statement admissible; the general requirement of relevance must also be met before the out of court statement is admissible evidence. (citations omitted)
State v. Martin, 458 So.2d 454, 460-61 (La.1984).
Evans' statement outlines the sequence of events which led to the defendant being charged. It also shows Evans' state of mind as to his belief that there was a question as to whether defendant had failed to pay for the winch and, therefore, why he brought it back to defendant's property.
Under these circumstances we find no error in the admission of Evans' testimony. This claim has no merit.
The second instance of alleged hearsay occurred during the testimony of Audrey Tate about conversations she allegedly overheard between the defendant and Paul Morin. The questioned testimony is as follows:
Q: How many times do you have personal knowledgewhat I mean, "personal knowledge", when you were present about Mr. Warren talking to Mr. Morin?
A: About with the money?
Q: Yes.
A: Three times.
Q: And those three conversation [sic], where did they occur?
A: On Paul's carport.
Q: And that is Paul Morin?
A: Yes.
Q: Can you remember the different conversations, one, two, and three?
A: The first one, no. The third one I do because, you see, I don't know if I could bring this up in court, but, you see, Tom and his wife were having arguments or disputes and Tom went and was not paying the money like he was supposed to.
Q: Paying what money?
A: For the winch. And Paul Morin told Tom [defendant] if he didn't come up with the money he would take the winch back and sell it to somebody else.
Q: And what else was said about the winch?
A: That is it.
Q: Okay. Did they tell Mr. Warren where the winch came from?
BY MS. CROSBIE:
Objection. He is leading.
BY THE COURT:
Sustained.
BY THE WITNESS:
But he did know where it came from.
BY MR. DIAZ:
Q: How do you know that?
*1041 A: Because Paul told Mr. Tom they took the winch from Lynn Dean, off of his property.
Q: Did they use the word "take" or "took"?
A: They said take.
Q: That was told to Mr. Warren?
A: Yes.
Q: Did they tell him when the winch was taken?
BY MS. CROSBIE:
Objection. Again, Your Honor, let the witness testify to what she knows. Mr. Diaz is leading the witness.
BY MR. DIAZ:
It's not a leading question.
BY THE COURT:
I think he can ask her when they said they took it. It is a proper question. I overrule that one.
BY MS. CROSBIE:
Your Honor, I would lodge a continuing objection to the leading.
BY THE COURT:
No I can't have a continuing objection. I know for brevity you would prefer a continuing objection, but unfortunately I cannot allow it. If there is a problem I would prefer, and I think the code of criminal procedure requires that you lodge an objection each and every time you feel there is one that is necessary.
Mr. Diaz, I ask that you restate the question again.
BY MR. DIAZ:
Q: Did your boyfriend tell Mr. Warren when the winch was taken from Mr. Dean.
BY MS. CROSBIE:
Objection.
BY THE COURT:
Overruled.
BY MS. CROSBIE:
Note my objection.
BY MR. DIAZ:
You can answer the question.
BY THE WITNESS:
(Comment stricken from the record).
BY MS. CROSBIE:
Objection, again, Your Honor.
BY THE COURT:
I am going to have to sustain unless we have personal knowledge, Mr. Diaz.
BY MR. DIAZ:
Q: Were you present when that was told to him, ma'am?
A: No, I was not.
BY THE COURT:
Hold on, Mr. Diaz. Cheryl, read the last answer back. I want to make sure they understand which one I am striking.
(REPORTER COMPLIES).
BY THE COURT:
Ladies and gentlemen, I am striking that from the transcript and asking you to totally disregard that. I am sustaining Ms. Crosbie's objection. The factsthere has been no actual knowledge and it's strictly a hearsay type of statement, and you must have personal observation or knowledge of it.
BY MR. DIAZ:
To which ruling the State notes an objection. It is clearly an exception to hearsay [sic]
BY MR. DIAZ:
Q: But you were present in a conversation with Mr. Morin and Mr. Warren?
A: Talking about the winch, yes.
Q: Where he was told of the origin of it?
A: Yes.
Q: Was he ever told it was stolen?
A: Yes. Paul told him that they were going to steal it. You see, they were going to sell it to somebody else and confronted Mr. Tom and asked him if he wanted to buy the winch. And after that the money started changing hands.
Q: And Mr. Tom is Mr. Tom here (indicating)?
A: Yes.
Tate claims Morin told the defendant that the winch was stolen from Elevating Boats. The relevancy of her testimony is to support the truth of the matter asserted, i.e., that the winch was stolen.
*1042 The State contends, however, that the propriety of the statement's admission may not be reviewed by this Court because defense counsel failed to make a contemporaneous objection.
The Supreme Court has stated:
Generally, a contemporaneous objection must be made immediately. In certain instances, however, objections which come shortly thereafter will be considered timely, and there are even instances in which no objections are required because they would be a vain and useless act. (citations omitted)
State v. Lee, 346 So.2d 682, 685 (La.1977). State v. Shoemaker, 500 So.2d 385 (La. 1987) extends this rule to hearsay testimony.
Since the trial court had previously ruled that it would allow the testimony as long as the witness was present during the conversation, it would have been useless for defense counsel to object further.
Thus, the failure to object is properly before this Court. We conclude the statement constitutes inadmissible hearsay and should not have been admitted.

ASSIGNMENT # 2
The defendant urges the jury verdict was not supported by sufficient evidence.
The standard of review for sufficiency of the evidence is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt the essential elements of the crime. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
La.R.S. 15:438 provides:
The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.
Illegal possession of stolen things is defined as:
[T]he intentional possessing, procuring, receiving, or concealing of anything of value which has been the subject of any robbery or theft, under circumstances which indicate that the offender knew or had good reason to believe that the thing was the subject of one of these offenses.
La.R.S. 14:69 A. The essential elements of the offense are:
(1) the item was stolen;
(2) the item was of value;
(3) the defendant knew or should have known that the property was stolen; and
(4) the defendant intentionally procured, received, or concealed the property.
State v. Mercadel, 503 So.2d 608 (La.App. 4th Cir.1987).
No evidence was presented to establish that the pressure regulator and counter balance valve were stolen. Nor was there any evidence as to the values of the butane tank, diesel tank, steel padeye and rotary coupling. Thus, the evidence is insufficient to support a conviction for the illegal possession of those items.
The uncontradicted evidence shows the defendant purchased the winch from Paul Morin. The only evidence that Morin stole the winch and that the defendant knew it was stolen came from Tate's hearsay testimony. Since that testimony was inadmissible, the evidence is insufficient to support a conviction for illegal possession of the winch.
Dean testified that he never sold a fan to the defendant and he assumed the fan was stolen because an alteration to the fan was similar to those made at his shipyard. He valued the fan at $100. Defendant testified he bought the fan while he worked at the shipyard through Dean's now deceased former partner and altered the fan just as was done at the shipyard, to prevent the same problem with slipping of the guard.
As to the two 2 inch couplings, Dean testified that they were machined by his company and sold as part of other painted equipment. He identified the unpainted couplings and valued them at $10 each. Defendant admitted the couplings did not belong to him but explained that they probably were left accidentally in his tool box *1043 after going out to a job while working for the shipyard.
Defendant's explanations of his possession of the fan and the couplings are reasonable. By contrast, Dean concluded the items were stolen based on ambiguous circumstantial evidence. This circumstantial evidence does not exclude the reasonable hypothesis of innocence suggested by the defendant. Thus, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found defendant guilty beyond a reasonable doubt of intentionally procuring, receiving or concealing stolen property.
This conclusion is further compelled by the likely taint created by the very prejudicial hearsay testimony from Tate which should have been inadmissible. Her testimony basically concerned circumstances allegedly involving the winch which was the focal point of the criminal charge. The hearsay testimony about the winch made it probable that the jury also considered the fan and couplings were stolen.
The conviction is reversed.
REVERSED.